## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

**In the matter of the complaint against:**
**ROBERT W. JONES (DOB 09/22/1970)**

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Rick E. McLain, a Special Agent of the Federal Bureau of Investigation (FBI), being duly sworn, depose and state the following:

1. I have been employed as a Special Agent (SA) with the Federal Bureau of Investigation (FBI) for over 23 years and am currently assigned to the Kansas City Division, Springfield, Missouri, Resident Agency. I have investigated a variety of federal criminal violations, including allegations involving murder for hire.

2. This affidavit is made in support of an application for a criminal complaint against ROBERT W. JONES, a Correctional Officer at the United States Medical Center for Federal Prisoners (USMCFP), Springfield, Missouri. As will be shown below, affiant believes there is probable cause to believe that JONES attempted to hire an individual to murder his wife's ex-husband in violation of Title 18, United States Code, Section 1958.

3. The facts set forth in this affidavit are based on information I personally have obtained during the course of my investigation which was initiated on May 20, 2012. It is also based on information provided to me by USMCFP Special Investigative Support (SIS) employees, specifically including SIS Lieutenant Dave Kreider, SIS Technician Bengie Ramos and SIS Technician Gary Krebs.

# THE INVESTIGATION

4.  On May 20, 2012, USMCFP SIS Technician Ramos contacted affiant and advised

    that he had conducted an interview on May 11, 2012, with a USMCFP inmate,

    hereafter identified as the cooperating inmate (CI).  The interview was initiated by the

    CI.  The CI stated that between March 2012 and April 21, 2012, he had participated

    in approximately 10 to 15 private conversations with USMCFP Correctional Officer

    JONES.  During these conversations, JONES requested that the CI connect him with

    someone (hereafter referred to as a "hitman") that would be willing to kill his

    (JONES') wife's ex-husband (hereafter referred to as a "John Doe") who is adversely

    affecting his marriage.  JONES offered to facilitate the process by bringing a cell

    phone into the USMCFP and allow the CI to call the individual, thereby avoiding the

    possibility of the conversation being recorded if the call were to be placed on a

    landline at the prison.  JONES also offered to pay the hitman and indicated that he

    had $2,000 and could come up with more if needed.  According to the CI, JONES

    was aware that the CI, prior to his incarceration, was in a leadership position within a

    known drug organization, and had connections to individuals who could carry out a

    request like that made by JONES.

5.  As a part of a routine quarterly personnel shift at the USMCFP, JONES was moved to

    a different unit than that which housed the CI.  As a result of the transfer, the CI and

    JONES were unable to meet for a period of time.  The CI later reestablished contact

    with JONES after being moved to a cell in the same unit that JONES was assigned.

6.  On 06/21/2012, the first day that both JONES and the CI were in the unit at the same

    time, the two met.  The unit's surveillance cameras recorded JONES standing in front

of the CI's cell and talking to him from 12:34 a.m. to 12:52 a.m. On at least three occasions, JONES is seen bringing his hand up to his ear in a manner suggesting the use of a telephone. The CI reported later that same morning to USMCFP SIS Technician Ramos that JONES once again brought up the conversation about getting someone to kill John Doe and offered to get the CI a cell phone so that he could call someone that would assist him in this endeavor. The CI confirmed that when JONES talked about the cell phone, JONES made a gesture with his hand as if he was holding a telephone to his ear.

7. On June 26, 2012, the CI contacted USMCFP SIS Lieutenant Kreider via the inmate informant line that connects to the SIS office. The CI reported that JONES and he met again earlier that same morning during which JONES instructed the CI to "keep working on it." Surveillance cameras positioned in the unit confirmed that JONES and the CI met that morning.

8. On June 28, 2012, affiant personally met with the CI at the USMCFP SIS office. The CI advised he met with JONES during the early morning hours on the same day (again verified by the unit's surveillance cameras). The CI reported that during their conversation that lasted approximately 30 minute JONES continued to discuss the murder-for-hire scheme. The CI noted that, although JONES made the comment he was uncertain if killing John Doe would help or hurt their marriage, it was the CI's opinion based on the conversation, JONES continued to be intent on hiring a hitman.

9. Between 07/02/2012 and 07/12/2012, the CI had multiple meetings with JONES who stood outside the CI's jail cell and spoke to him through an opening in the door. All the meetings were captured on the unit's surveillance system and the nature of the

conversations were later reported by the CI to Lieutenant Kreider via the inmate informant telephone line as mentioned above.  A summary of what was discussed in these meetings are as followed:

A. On 07/02/2012, JONES and the CI once again discussed the CI assisting JONES in finding an individual who would be willing to kill John Doe.  The CI informed JONES he would need to provide the hitman with $1,500 and a description of John Doe.  In response, JONES stated, "Okay, I'll take care of it."

B. On 07/05/2012, JONES again discussed his desire to hire someone to kill John Doe.  The CI also noted that JONES claimed his wife left him and took all their belongings except the couch, television and bills, and he (JONES) would have to find a way to come up with the money to hire the hitman.  JONES reportedly blamed John Doe for his wife's departure.

C. On 07/06/2012, the CI gave JONES a cell phone number and told JONES it was the contact number for the hitman.  Prior to this meeting, Lieutenant Kreider made arrangements to give the CI this telephone number which was previously obtained by affiant.  FBI technically trained personnel arranged to have calls placed to the number rerouted to a cell phone operated by an agent with the FBI working in an undercover capacity (hereafter UC) and posing as a hitman named "Chuey," a nickname previously given to JONES by the

CI. Calls made to the aforementioned telephone number were consensually recorded.

D. On 07/09/2012, JONES told the CI he planned on seeing people about getting money needed to hire the hitman.

E. On 07/12/2012, JONES told the CI he did not have the money to hire the hitman to kill John Doe and claimed his wife took the money when she left him. JONES informed the CI that he planned on calling the hitman and would offer his truck as payment to kill John Doe.

10. On 07/12/2012, at approximately 8:00 a.m., a male individual called the UC via the aforementioned telephone number. The caller asked to speak with "Chuey" and thereafter stated he was a friend of the CI whom he identified by the CI's nickname. The UC informed the caller he was in St. Louis, Missouri, and instructed the caller to contact him later in the afternoon to set up a face-to-face meeting in Springfield on 07/13/2012. The caller agreed.

11. The caller's telephone number was captured on the UC's cell phone "caller ID" feature as (417)992-2007. However, a review of public data bases for this number did not identify the subscriber.

12. SIS Technician Krebs advised he was familiar with JONES' voice and after having listened to the above mentioned consensually recorded telephone conversation, he confirmed that the caller was JONES.

13. At approximately 9:15 p.m. on 07/12/2012, JONES placed a telephone call to the UC. During the ensuing conversation, JONES agreed to meet the UC in the food court located inside the Battlefield Mall, Springfield, Missouri, at 10:30 a.m. on 7/13/2012.

JONES told the UC that he wanted to go through with this and that the CI would help him (JONES) pay the UC.

14. On 7/13/12, JONES met the UC at the Battlefield Mall. JONES told the UC that he would pay him $1,500.00 to commit the murder of John Doe. JONES provided the UC with a photograph of John Doe. JONES also provided the UC with information describing John Doe as well as his home address. JONES then provided the UC with $1,500.00 cash.

15. At the conclusion of the meeting JONES was taken into custody. JONES was later questioned after being advised of his *Miranda* rights. JONES confessed that he intended to hire the UC to kill John Doe. JONES subsequently executed a written confession detailing the scheme to kill John Doe.

16. Based on the foregoing, there is probable cause to believe that USMCFP Correctional Officer ROBERT W. JONES has used a facility of interstate commerce, with the intent that a murder be committed in violation of the law of the State of Missouri, in violation of Title 18, United States Code, Section 1958.

_____/s/ Rick E. McLain_____
Rick E. McLain
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me
this 13th day of _____July_____, 2012

_____/s/ James C. England_____
UNITED STATES MAGISTRATE JUDGE